190 P.3d 86 (2008)
Nick J. AUGUST, beneficiary and remainderman of Norma L. August Irrevocable Living Trust, Joseph M. August Family Trust, Joseph M. August Disclaimer Trust, Estate of Norma L. August, and Estate of Joseph M. August, Appellant,
v.
U.S. BANCORP, a Delaware corporation, personal representative of the Estates of Joseph M. August and Norma L. August, and its wholly-owned subsidiary, U.S. Bank National Association, trustee of the Norma L. August Irrevocable Living Trust, Joseph M. August Family Trust, and Joseph M. August Disclaimer Trust, and its wholly-owned subsidiary, U.S. Bancorp Asset Management, Inc., a Delaware corporation, Respondents.
No. 26003-8-III.
Court of Appeals of Washington, Division 3.
August 7, 2008.
*88 Lloyd Allen Herman, Attorney at Law, Spokane, Christopher James Herman, Lloyd A. Herman & Associates, Spokane Valley, WA, for Appellant.
David Laurence Broom, Paine Hamblen LLP, Spokane, WA, for Respondents.
KULIK, A.C.J.
¶ 1 U.S. Bancorp, U.S. Bank National Association, and U.S. Bancorp Asset Management, Inc. (Bank) served as the trustee of the Joseph M. August Family Trust, the Joseph M. August Disclaimer Trust, and the Norma L. August Irrevocable Living Trust. The Bank was also the personal representative for Joseph and Norma August's estates. In 2002, the Augusts' son, Nick August, filed a petition challenging the personal representative's fees and a declaration explaining the basis for his petition. The court granted the Bank's fees. In 2004, Nick[1] discovered three boxes of his parents' financial papers. He then filed this action against the Bank alleging breach of fiduciary duty.
¶ 2 The trial court granted summary judgment in favor of the Bank based on the statute of limitations. On appeal, Nick contends his action is not time-barred because he discovered the elements of his action against the Bank in 2004. He also asserts that he was unable to discover the elements of his claim because of the Bank's fraudulent concealment. Because there are material issues of fact concerning whether and when *89 Nick knew of the elements of his cause of action against the Bank, we reverse the summary judgment and the denial of the motion for reconsideration. We also reverse the trial court's denial of Nick's request to amend his complaint to include fraudulent concealment.

FACTS
¶ 3 Nick's father, Joseph August, died on November 23, 1996. Joseph August's will created two testamentary trusts, known as the Joseph M. August Family Trust (Joseph Trust) and the Joseph M. August Disclaimer Trust (Disclaimer Trust). Two years later, the Bank was named as the successor trustee of both trusts. At the same time, Nick and his sister, Joanne Halvorson, created the Norma L. August Irrevocable Living Trust (Norma Trust). The Bank was also the trustee of the Norma Trust.
¶ 4 In 2000, the Joseph August estate initiated a lawsuit against Ms. Halvorson. The Bank was substituted as plaintiff after it was appointed as personal representative. The court dismissed the lawsuit on the stipulation of the Bank and Ms. Halvorson.
¶ 5 Norma August died on October 6, 2002. The Bank acted as personal representative of the estate of Norma August. Nick is a remainderman of the Joseph Trust and the Norma Trust. He is a beneficiary of the Disclaimer Trust and the estates of both Joseph and Norma August.
¶ 6 The Bank filed a motion to obtain court approval for payment of fees and to discharge itself as the personal representative of the Joseph August estate. The Bank also filed a declaration of completion of the estate. Nick filed a petition to require a hearing on the reasonableness of fees and to extend the date to grant a discharge of the personal representative. He also filed his declaration.
¶ 7 Nick's declaration of September 11, 2002, reads, in part:
5. This Paragraph was inserted in said Trust because I believe that approximately $500,000.00 of community funds of the above named decedent still remains unaccounted for. It is also my belief that U.S. Bank has never properly completed the examination called for under said paragraph nor has the bank provided me or the then Estate's attorney James J. Workland, with Bank records, brokerage statements, or any documents or records explaining where community funds, which should be property of the Estate, have gone. Unless Subpoenas and Requests for Production arising out of these proceedings are issued to various banks and brokerage houses, the disposition of these funds will never be known.
6. The Bank continued a suit against my sister, Joanne Halvorson and it is believed that the Bank negligently conducted its investigation into the facts and circumstances leading up to said lawsuit and improperly entered into a Joint Stipulation with my Sister, Joanne Halverson [sic], dismissing the suit.
7. I also believe that the Bank mismanaged the investment portfolios turned over to the Bank to manage. I believe that the Bank was negligent in converting equities and bonds into mutual funds owned and managed by the Bank. I am advised and believe that the Bank lost approximately $400,000.00 in investment value for my Mother's Trust during the year 2001.
8. I also am under the belief that the Bank which charges a fee based on the value of assets managed, changed [sic] a fee of approximately $15,000.00 for managing a rental property. The same rental property at the time it was delivered to the Bank in trust was subject to an option to purchase. When the transaction closed, an additional fee of 1% of the selling price or $15,000.00 was charged the Trust by the Bank to deposit funds into the Trust. The Bank did not negotiate the sale of the property as the option was self executing. Therefore I believe the Bank received a double payment.

. . . .
¶ 10. I do not have sufficient funds to proceed with litigation unless the Bank advances me funds as a distributee or under a disclaimer trust created under the decedent's last Will.
*90 Clerk's Papers (CP) at 550-51 (emphasis added).
¶ 8 Nick believed that the Bank had negligently conducted its investigation into the facts leading up to the lawsuit filed against his sister, and that the Bank had improperly entered into a stipulation dismissing her suit. Hannelore Wright, a Bank representative, submitted a declaration stating that $400,000 had been transferred to Joanne Halvorson and her family. According to Ms. Wright, a thorough investigation was conducted, and the decision was made to voluntarily dismiss the lawsuit against Ms. Halvorson. Ms. Wright stated that the losses in the trusts were due to the stock market. The court approved the Bank's motion for discharge as personal representative and its fees.
¶ 9 On September 25, 2002, Nick requested a distribution of $10,000 from the Disclaimer Trust so that he could commence litigation against the Bank. The Bank denied the request. In June 2003, Nick signed releases in favor of the Bank in connection with the distribution on the Joseph Trust and the Disclaimer Trust.
¶ 10 After Norma August's death in 2002, Nick hired Elaine Myers to help him with the accounting of the estate. Ms. Myers told Nick that when she was working for the accounting firm of LeMaster & Daniels, she boxed up his parents' financial records and placed them in storage. Ms. Myers also stated that the Bank knew about these records because the attorney who represented the Norma Trust had called and asked about them.
¶ 11 Nick obtained this box in December 2004. In the box, Nick found documents showing that his sister had borrowed $60,000 from his parents that she had not repaid. In late 2004, Nick also found a box of checks and check stubs in his mother's former home. He discovered that $20,000 had been paid to Ms. Halvorson's husband and $30,000 to her daughter. In 1995, $80,000 was paid to Ms. Halvorson and her family as gifts.
¶ 12 In 2004, Nick also obtained a third box from the building formerly occupied by Joey August Distributors, Inc. This box contained brokerage statements from Merrill Lynch regarding the purchase of silver, gold, and platinum coins that had been purchased in 1983 for the price of $69,754.44. However, no gold coins or other investments were found in the safety deposit boxes.
¶ 13 After these discoveries, Nick asked Greer G. Bacon and James H. Garbrick, who had financial backgrounds, to examine the papers. They told Nick the Bank's handling of his mother's assets was improper. Mr. Garbrick states in his declaration that the Bank was grossly negligent in its allocation of Norma August's assets. Mr. Bacon found many other deficiencies, including a failure by the Bank to perform reviews which are the "foundation of the prudent investment process." CP at 726.
¶ 14 On July 2, 2004, the Bank filed a petition for approval of final report and accounting and decree of distribution of the Norma L. August estate. Nick filed an objection, contesting only the accounting and the allocations to the beneficiaries. He also filed a declaration.
¶ 15 In his declaration, Nick complained that the accounting did not provide any information with regard to the Norma Trust before the death of Norma August on October 6, 2002. He also stated that the accounting failed to explain the $1 million drop in value from the time the Norma Trust was set up until the distribution of the estate.
¶ 16 The court found that "[t]hroughout the time it served as Trustee of the Trust Estate, U.S. BANK prepared and beneficiaries received monthly financial statements in the ordinary course of business." CP at 521. The court discharged the Bank as personal representative.
¶ 17 2005 Complaint. Nick commenced this lawsuit on December 9, 2005, alleging that the Bank had failed to discharge its fiduciary duties to him by abusing its discretion under the trusts, and carelessly and negligently handling trust assets.
¶ 18 The complaint alleges that the Bank: (1) failed to perform the examinations required under paragraph V of the Norma Trust; (2) failed to use investments to diminish tax liability; (3) failed to perform its duties and obligations by not determining the *91 needs of the beneficiary; (4) improperly converted trust assets into mutual funds that were a proprietary product of the Bank; (5) failed to pursue the suspected disappearance of funds from the estates; (6) failed to evaluate low-quality and low-yield funds; (7) charged excessive fees in the management of real estate; and (8) failed to roll an annuity from the Joseph Trust into the Norma Trust.
¶ 19 To support these claims, Nick alleged the following facts.
¶ 20 The funds from the Disclaimer Trust and the Norma Trust were transferred to the Bank for management by April 1999.[2] When the transfer occurred, Nick was unaware that within this $1,180,652, there were low-quality and low-yield mutual funds requiring immediate analysis by the Bank to convert them to income-producing securities. The cost of care and maintenance for Norma August was $200,000 per year until she died in 2002.
¶ 21 There was an annuity valued at $300,000 that the Bank failed to roll into Norma August's name. Instead, the Bank requested a lump sum distribution causing Norma August to pay taxes on the annuity at an unnecessarily high rate. The Bank then invested the money in low-yielding mutual funds and stock. Nick was not consulted or informed about these transactions before the release of the Bank's monthly statements.
¶ 22 The August estates' real estate holdings included a building on Alki Avenue, worth $1.5 million, a South Hill home, worth about $180,000, and a condominium in Twin Lakes, Idaho, worth $215,000. The Alki building was subject to a lease option. In 2000, the Alki building was sold for $1.5 million. Before the sale, the Alki building provided for Norma August $7,500 per month in income, plus excess rents. After the sale, this income needed to be replaced by proper management by the Bank. Instead, the Bank invested the trust assets in low-yielding common stock. Of the $1.5 million, $750,000 was placed in Norma August's estate, $190,845 was placed in the Disclaimer Trust, and $559,155 was placed in the Joseph Trust. The estates were valued at $3.5 million.
¶ 23 In June 2000, the Bank used trust money to purchase $200,000 in municipal bond funds and $320,000 in First American Mutual Funds, both of which were proprietary products of the Bank. Nick and other beneficiaries were not informed about these purchases until they received the Bank's monthly statements. Between March 1 and May 31, 2000, there was a change from real estate equity to cash in the Disclaimer Trust in the amount of $188,000. The Bank also purchased $145,000 in common stock. In June, $81,500 was used to buy municipal bonds and $111,000 was used to buy stock in First American Mutual Funds. Nick was not consulted or informed of these purchases until the release of the Bank's monthly statements.
¶ 24 In February 2000, the Norma Trust had $1.15 million in assets. In March 2000, the Bank used $292,000 to purchase common stock. Between March and April, the stock values dropped $30,000. In June, total stock assets went from $550,000 to approximately $1,150,000. An additional $596,000 was taken to purchase more stock. Over $400,000 was placed in First American Mutual Funds. Again, Nick was not consulted or informed about these purchases before the release of the Bank's monthly statements.
¶ 25 When Norma August died in October 2002, her estate was valued at $1,475,034.16, down from the $2.3 to 2.5 million value it was in 1998.
¶ 26 Summary Judgment. In October 2006, the Bank filed a motion for summary judgment, based primarily on the three-year statute of limitations set forth in RCW 11.96A.070(1)(a). The court granted summary judgment in favor of the Bank based on the statute of limitations. The court also denied Nick's motion for reconsideration. He appeals.

ANALYSIS
¶ 27 When reviewing an order of summary judgment, this court engages in the same inquiry as the trial court. Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 *92 (1982). All facts and inferences are considered in the light most favorable to the nonmoving party. Yakima Fruit & Cold Storage Co. v. Cent. Heating & Plumbing Co., 81 Wash.2d 528, 530, 503 P.2d 108 (1972). A summary judgment should be granted only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Wilson, 98 Wash.2d at 437, 656 P.2d 1030.
¶ 28 We review the denial of a motion for reconsideration for an abuse of discretion. Chen v. State, 86 Wash.App. 183, 192, 937 P.2d 612 (1997).
¶ 29 Collateral Estoppel. Collateral estoppel bars any subsequent litigation if (1) the issues decided in the prior adjudication would have been identical with the ones that were to be presented in the second action; (2) the prior adjudication ended in a final adjudication; (3) the party against whom the plea would have been asserted was a party or in privity with a party to the prior adjudication; and (4) application of the doctrine of collateral estoppel would not work an injustice. Nielson v. Spanaway Gen. Med. Clinic, Inc., 135 Wash.2d 255, 262-63, 956 P.2d 312 (1998). Under the fourth factor, the court must consider whether the parties to the earlier adjudication were afforded a full and fair opportunity to litigate their claim in a neutral forum. Id. at 264-65, 956 P.2d 312.
¶ 30 In August 2002, the Bank filed a declaration of completion of the estate of Joseph M. August. In response, Nick filed a petition to require a hearing on the reasonableness of fees and to extend the date to grant discharge of the personal representative, along with his supporting declaration. The declaration stated his belief that the Bank (1) did not complete the examination called for in paragraph V of the Norma Trust, (2) negligently conducted its investigation into the facts leading up to the lawsuit against Ms. Halvorson, (3) mismanaged investment portfolios, (4) was negligent in converting equities and mutual funds owned by the Bank, (5) lost $400,000, and (6) charged excessive fees.
¶ 31 The declaration also stated that no prejudice would result to Norma August if the discharge of the personal representative was delayed "until such time as a further investigation into the facts and a review of fees and other acts and conduct of the Personal Representative are completed." CP at 551.
¶ 32 The court approved attorney, accountant, and administrative fees requested by the Bank. Importantly, the court found that the Bank "conducted a proper and reasonable investigation concerning the Estate's alleged claims against Joanne Halvorson, and properly dismissed said claims." CP at 576. The court made no mention of the other allegations in Nick's declaration.
¶ 33 When an issue is not reached in the prior adjudication, that issue can have no preclusive effect in the second adjudication. Moreover, collateral estoppel applies only to ultimate facts, those facts upon which the claim rests. McDaniels v. Carlson, 108 Wash.2d 299, 305, 738 P.2d 254 (1987). Collateral estoppel does not extend to evidentiary facts which are only collateral to the claim. Id. To determine whether collateral estoppel applies, the court must determine whether the factual findings in the earlier action support the elements to be established in the second action. In re Apfel-Wilson, 165 B.R. 939, 941 (Bankr.W.D.Wash.1994).
¶ 34 Nick's petition was to delay the discharge of the personal representative. In its 2002 order, the court did not refer to Nick's declaration or his other claims. Instead, the court made a finding concerning the lawsuit against Joanne Halvorson and resolved that one issue. In its 2002 order, the trial court based its decision only on the statute of limitations.
¶ 35 Hence, collateral estoppel does not apply except for the finding concerning the Bank's investigation of Joanne Halvorson.
¶ 36 Statute of Limitations. Nick contends the trial court erred by granting summary judgment on the statute of limitations because he did not have access to all of the documents and facts until December 2004 when he found the boxes containing his parents' financial papers. Nick asserts that his *93 knowledge of the specific acts committed by the Bank was acquired after he found the boxes. He maintains the statute of limitations did not begin to run until December 2004 when he had an actual, viable claim against the Bank for breach of fiduciary duty. In contrast, the Bank asserts Nick's cause of action occurred no later than September 11, 2002, when he submitted his declaration. The present action was filed on December 9, 2005.
¶ 37 Nick also maintains that the Bank was grossly negligent in the allocation of his mother's assets. In his view, the Bank's handling of her account was extremely aggressive and inappropriate in light of her age and health. For example, Nick alleged that he found no evidence that the Bank did pre- and post-asset reviews as required by statute. Mr. Bacon stated that the Bank performed annual reviews sporadically, and failed to perform reviews 74 percent of the time. But Ms. Wright stated in her declaration in 2002 that all of the reviews had been performed, but "some of the documents reflecting those reviews are not available in our local files for reasons currently unknown to me." CP at 835.
¶ 38 RCW 11.96A.070(1)(a) provides:
An action against the trustee of an express trust for a breach of fiduciary duty must be brought within three years from the earlier of:
(i) The time the alleged breach was discovered or reasonably should have been discovered; (ii) the discharge of a trustee from the trust as provided in RCW 11.98.041 or by agreement of the parties under RCW 11.96A.220; or (iii) the time of termination of the trust or the trustee's repudiation of the trust.
(Emphasis added.)
¶ 39 RCW 11.96A.070(1)(a) incorporates the discovery rule by stating that the statute of limitations begins to run when "the alleged breach was discovered or reasonably should have been discovered." When the discovery rule applies, "a cause of action does not accrue until a party knew or should have known the essential elements of the cause of actionduty, breach, causation, and damages." Green v. A.P.C., 136 Wash.2d 87, 95, 960 P.2d 912 (1998).
¶ 40 When applying the discovery rule, the court considers whether the plaintiff had knowledge of the factual basis for the cause of action, not the legal basis. Germain v. Pullman Baptist Church, 96 Wash.App. 826, 832, 980 P.2d 809 (1999). "The action accrues when the plaintiff knows or should know the relevant facts, whether or not the plaintiff also knows that these facts are enough to establish a legal cause of action." Allen v. State, 118 Wash.2d 753, 758, 826 P.2d 200 (1992).
¶ 41 "The general rule in Washington is that when a plaintiff is placed on notice by some appreciable harm occasioned by another's wrongful conduct, the plaintiff must make further diligent inquiry to ascertain the scope of the actual harm." Green, 136 Wash.2d at 96, 960 P.2d 912. A plaintiff who has notice of facts sufficient to cause injury is deemed to have notice of all acts which reasonable inquiry would disclose. Hawkes v. Hoffman, 56 Wash. 120, 126, 105 P. 156 (1909). "The statute of limitations is not postponed by the fact that further, more serious harm may flow from the wrongful conduct." Green, 136 Wash.2d at 96, 960 P.2d 912.
¶ 42 "Unless the evidence is undisputed or unless reasonable minds cannot differ, what a person knew or should have known at a given time is a question of fact." Gillespie v. Seattle-First Nat'l Bank, 70 Wash.App. 150, 170, 855 P.2d 680 (1993). Whether a plaintiff has exercised due diligence under the discovery rule is a question of fact. Mayer v. City of Seattle, 102 Wash. App. 66, 76, 10 P.3d 408 (2000). The issue of whether a plaintiff has suffered actual damages triggering the statute of limitations "can be decided as a matter of law if reasonable minds could reach but one conclusion." Hudson v. Condon, 101 Wash.App. 866, 875, 6 P.3d 615 (2000). Because the statute of limitations is an affirmative defense, the burden of proof is on the defendant. Mayer, 102 Wash.App. at 76, 10 P.3d 408.
¶ 43 The Bank contends that all of the claims made in the 2005 complaint were previously *94 made in Nick's 2002 affidavit. As a result, the Bank argues that Nick discovered his cause of action on September 11, 2002.
¶ 44 In his 2002 affidavit, Nick stated that the Bank was not performing the examination called for under paragraph V. He also alleges this in his 2005 complaint. Because this statement in Nick's affidavit clearly indicates that he was aware of all the elements of this claim on September 11, 2002, this particular claim is barred by the statute of limitations.
¶ 45 In his 2002 affidavit, Nick stated that the Bank negligently conducted the investigation leading up to the lawsuit against his sister and then improperly entered into a joint stipulation to dismiss the suit. While he does not make similar allegations in his complaint, he does make these allegations in his brief. These claims are barred by collateral estoppel. In 2002, the court made a finding that the Bank "conducted a proper and reasonable investigation concerning the Estate's alleged claims against Joanne Halvorson, and properly dismissed said claims." CP at 576.
¶ 46 In his 2005 complaint, Nick alleges the Bank charged excessive fees and bought its propriety products with trust funds. Given the detailed nature of his statements in his affidavit, these claims are barred by the statute of limitations.
¶ 47 In his complaint, Nick also makes allegations that the Bank: failed to use investments to diminish tax liability, failed to determine the needs of the beneficiary, failed to identify and evaluate low-quality and low-yield funds, and failed to roll an annuity from the Joseph Trust into the Norma Trust to avoid disadvantageous tax consequences. The Bank argues that these claims are included in the affidavit as part of the statement that the Bank "mismanaged the investment portfolios turned over to the Bank." CP at 551.
¶ 48 However, this expansive reading of the phrase "mismanaged the investment portfolios" is not warranted. Reading the paragraph as a whole, Nick may have been stating only that the Bank mismanaged assets by converting equities and bonds into the Bank's propriety products.
¶ 49 The Bank also argues that Nick had sufficient information to file his complaint in 2002. Nick argues that the allegations in his complaint related to investment strategy and the failure of the Bank to provide information were not discoverable until 2004. To support his argument, he relies on Gillespie.
¶ 50 The Gillespie family brought a claim for professional negligence against Seattle-First National Bank (Sea-First) alleging the mismanagement of a trust estate. Gillespie, 70 Wash.App. at 153, 855 P.2d 680. The Gillespies had been aware that the trust had incurred losses, but they were unaware that the losses were caused by the trustee, Sea-First. The Gillespies filed their lawsuit after the three-year statute of limitations had run. Sea-First sought dismissal of the action arguing that the statute started running when the Gillespies first received reports of the losses. Id. at 160, 855 P.2d 680.
¶ 51 The court concluded that the statute of limitations did not start until the Gillespies knew the elements of their claim, i.e., duty, breach, causation, and damages. Id. at 167, 855 P.2d 680. The court found that the Gillespies were financially unsophisticated, and relied on Sea-First's expertise. Consequently, the court held that the statute of limitations did not begin to run until the Gillespies discovered Sea-First's breach of fiduciary duty, which was when they became aware that the trust losses were not merely temporary setbacks. Id. at 167-68, 855 P.2d 680. The court noted that the documents and financial reports provided by Sea-First over the years were not enough to give the Gillespies constructive notice of any possible breaches of fiduciary duty. The court held that before any obligation of due diligence arose, something must happen to cause the plaintiff, who is relying on the expert, to suspect malpractice. Id. at 171-72, 855 P.2d 680.
¶ 52 Nick argues that like the Gillespies, he lacked the expertise to determine whether the Bank had mismanaged the trust accounts. He also asserts that while his intuition told him the trusts were being mismanaged, *95 the Bank thwarted his attempts to investigate.
¶ 53 Gillespie is instructive. Gillespie was an appeal after a trial and the unchallenged findings established that while the family was aware they were losing money, they thought it was merely a "`temporary setback' until... it became clear that something was seriously wrong." Id. at 168, 855 P.2d 680. Similarly here, Nick was not an experienced investor, and representatives from the Bank assured him that the trusts' losses were the result of a market downturn.
¶ 54 The Bank points out that on September 25, 2002, Nick requested a distribution of $10,000 from the Disclaimer Trust to commence litigation against the Bank. The Bank takes the position that when this request was denied, Nick sat back and did nothing until he came into contact with Ms. Myers and learned of the box of documents at LeMaster & Daniels.
¶ 55 But Nick is not an experienced investor. In Gillespie, the court concluded that:
Before any such obligation of due diligence can arise, something first must happen to cause the one who justifiably relies upon his or her own expert reasonably to suspect that malpractice may have occurred. That "something" must be "something more" than that which the professional adviser describes as a "temporary setback", at least for so long as a reasonable person in those same circumstances would reasonably conclude, based upon what he or she is being told by the expert advisor, that what is occurring is only a "temporary setback."
Id. at 171-72, 855 P.2d 680.
¶ 56 The evidence here is disputed and reasonable minds can differ; consequently, the question of what Nick knew or should have known is a question of material fact that cannot be resolved here. The court erred by granting summary judgment.
¶ 57 Fraudulent Concealment. Nick first raised the issue of fraudulent concealment in his motion for reconsideration. The trial court concluded that Nick "failed to demonstrate any essential elements of his claim which were unknown to him." CP at 857. The court also determined that Nick had "adduced no evidence supporting the existence of a genuine issue of material fact which would demonstrate that the statute of limitations on his claim did not begin [to run] at or before September 11, 2002." CP at 857. The court did not state that it had disallowed the introduction of the new theory. Hence, the court apparently allowed Nick to argue the new theory of fraudulent concealment on reconsideration.
¶ 58 The Bank argues that a party is not allowed to introduce a new theory into a case in order to obtain a new trial. To support this position, the Bank relies on International Raceway, Inc. v. JDFJ Corp., 97 Wash. App. 1, 970 P.2d 343 (1999). In International Raceway, after the trial, the court denied the relief first requested by JDFJ in its motion for reconsideration. Id. at 5, 970 P.2d 343. The appellate court concluded that JDFJ was attempting to amend its complaint, "violating equitable rules of estoppel, election of remedies, and the invited error doctrine." Id. at 7, 970 P.2d 343.
¶ 59 However, International Raceway is distinguishable. First, the motion to reconsider in International Raceway was filed after a trial. The motion for reconsideration here was filed after a motion for summary judgment. "In the context of summary judgment, unlike in a trial, there is no prejudice if the court considers additional facts on reconsideration." Chen, 86 Wash. App. at 192, 937 P.2d 612. Second, even after a trial, generally, an issue may be raised in a motion for reconsideration when the issue is closely related to an issue previously raised and no new evidence is required. Anderson v. Farmers Ins. Co., 83 Wash.App. 725, 734, 923 P.2d 713 (1996). Here, the court properly considered fraudulent concealment on reconsideration.
¶ 60 Fraudulent concealment of a cause of action tolls the statute of limitations. Giraud v. Quincy Farm & Chem., 102 Wash. App. 443, 452, 6 P.3d 104 (2000). When a defendant "`electing to set up the statute of limitations has previously, by deception or any violation of duty towards plaintiff, caused him to subject his claim to the statutory bar, *96 he must be charged with having wrongfully obtained an advantage which the court will not allow him to hold.'" Erbe v. Lincoln Rochester Trust Co., 13 A.D.2d 211, 213, 214 N.Y.S.2d 849 (1961) (quoting 53 C.J.S., Limitations of Actions, § 25, pp. 963-64).
¶ 61 To prove fraudulent concealment, the plaintiff must show (1) the plaintiff exercised due diligence in trying to uncover the facts, and (2) the defendant engaged in affirmative conduct that would lead a reasonable person to believe that no claim of fraudulent concealment existed. Nordhorn v. Ladish Co., 9 F.3d 1402, 1406 (9th Cir.1993). Silence or passive conduct by a defendant is not fraudulent unless the relationship of the parties is fiduciary; then, there is a duty on the defendant to disclose. Thorman v. American Seafoods Co., 421 F.3d 1090, 1096 (9th Cir.2005) (quoting Conmar Corp. v. Mitsui & Co., 858 F.2d 499, 505 (9th Cir.1988)).
¶ 62 Nick contends the Bank thwarted his attempt to exercise due diligence when it denied him the funds to retain counsel to represent him in his attempts to review the Bank's actions. Nick asserts he was unaware that the Bank was not performing account reviews before acceptance or annual reviews after acceptance. He also claims the statements from the Bank were misleading. Nick argues that he did not challenge the faulty investment strategies employed by the Bank because Bank officials told him that the losses sustained by the trusts were caused by the bear market. Nick asserts that he is an unsophisticated beneficiary.
¶ 63 The Bank argues that Nick's claims are without merit. The Bank points out that Nick cites no authority for the proposition that failure to comply with a beneficiary's request for distributions from the trust removes the beneficiary's requirement to exercise due diligence or tolls the statute of limitations. The Bank also asserts that the record is devoid of any evidence that the losses were not proportional to the bear market and that the investment in proprietary funds is not authorized by RCW 11.100.035.
¶ 64 Because the underlying motion is a summary judgment motion, we must determine whether the court erred by determining that there was no issue of material fact concerning Nick's claim of fraudulent concealment. Here, the allegation that Nick is an unsophisticated beneficiary, coupled with his allegations concerning the Bank's failure to disclose and the Bank's missing or misleading statements, are sufficient to raise a material issue of fact as to whether there was fraudulent concealment.
¶ 65 The Bank argues that the failure to provide information does not establish fraudulent concealment. But Thorman held that silent or passive conduct is not deemed fraudulent unless there is a fiduciary relationship; under these circumstances, there is a duty upon the defendant to make a disclosure. Thorman, 421 F.3d at 1096. The Bank also argues that Nick did not file suit in 2002 and never filed a motion to compel production of the documents he believed were missing or withheld. Again, Nick's duty to be diligent relies on the factual determination as to when Nick knew, or should have known, the elements of a cause of action. The question as to what Nick knew is a question of material fact that cannot be resolved here.
¶ 66 Conclusion. We reverse the summary judgment because there are material issues of fact. We also reverse the denial of Nick's motion for reconsideration and motion to amend the complaint to include fraudulent concealment.
WE CONCUR: SWEENEY and BROWN, JJ.
NOTES
[1] We refer to Nick August by his first name for clarity.
[2] Before January 1999, the August trusts were managed by D.A. Davidson.